# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**") is made as of this _____ day of _____, 2011, by and among DAMON'S RESTAURANTS, INC., an Ohio corporation ("**Seller**"), and _____ ("**Buyer**"):

## BACKGROUND:

WHEREAS, Seller owns and operates the restaurants listed on <u>Exhibit A</u>, attached hereto (each a "Restaurant" and collectively the "**Restaurants**");

WHEREAS, Seller desires to sell, and Buyer desires to purchase, certain of the assets of Seller used or useful in connection with, or necessary to, the operation of the Restaurants, as such is currently being operated by Seller, to include the liquor license relating to each Restaurant, all on the terms and conditions addressed herein;

NOW, THEREFORE, in consideration of the mutual representations, warranties, covenants and agreements set forth in this Agreement, and intending to be legally bound, the parties agree as follows:

1. **DEFINITIONS.** In addition to such other terms as may be defined elsewhere herein, for purposes of this Agreement, the following terms shall have the meanings given them below:

    (a) "**Acquired Business**" means the operation of each of the Restaurants as currently conducted by Seller.

    (b) "**Assets to be Acquired**" has the meaning set forth in Section 2.1.

    (c) "**Closing**" has the meaning set forth in Section 3.2.

    (d) "**Closing Date**" means the date on which the Closing actually occurs.

    (e) "**Excluded Assets**" has the meaning set forth in Section 2.2.

    (f) "**Hazardous Materials**" includes hazardous waste, hazardous substances, toxic substances and all related materials, including all materials and substances regulated by The Comprehensive Environmental Response, Compensation and Liability Act of 1980, The Resource Conservation and Recovery Act of 1976, The Superfund Amendments and Reauthorization Act of 1986, The Clean Water Act, The Clean Air Act, The Toxic Substance Control Act, all as amended from time to time, and/or any other applicable federal, state or local environmental law, statute, rule, regulation, or ordinance.

    (g) "**Inventory**" has the meaning set forth in Section 2.1(b).

(h)  "**Knowledge of Seller**" means the actual knowledge, after reasonable investigation or inquiry.

(i)  "**Leases**" means all of Seller's leases and subleases of real property, equipment and other tangible property used or held for use in connection with the Acquired Business which shall not be assumed by Buyer unless expressly provided otherwise by the parties prior to or at Closing and attached hereto as a schedule.

(j)  "**Lien**" means any security interest, pledge, hypothecation, assignment, charge, lien or other encumbrance.

(k)  "**Taxes**" means all foreign, federal, state, county or local income taxes, social security taxes, real property taxes, transaction privilege, sales or use taxes, unemployment and other payroll taxes, franchise taxes, and all other taxes which have accrued, or which could have been or have been levied, assessed or imposed upon Seller by any governmental entity, or which should have been paid by law, and which arise out of the ownership or operation of the Acquired Business or the Assets to be Acquired on or prior to the Closing Date.

(l)  "**Total Consideration**" has the meaning given it in Section 3.1.

(m)  "**Supplies**" means current non obsolete materials and supplies on hand held for use including liquor, dry goods, tables, chairs, china, glasses, utensils, pots, pans and all other items located at the Restaurants or otherwise held for use in connection with the Acquired Business as of the Closing Date to operate the business as an ongoing concern day to day, as determined by the physical inventory referenced in Section 3.1(b)(i) below.

## 2.  PURCHASE AND SALE OF ASSETS

2.1  Purchase and Sale of Assets to be Acquired.

Upon the terms and subject to the conditions of this Agreement, at the Closing Seller will sell, transfer, assign and deliver to Buyer, and Buyer will purchase and acquire from Seller, all right, title, interest and benefit in and to the following assets, but specifically excluding the Excluded Assets (collectively, the "**Assets to be Acquired**"):

(a)  All of the machinery, equipment, furniture, furnishings, and fixtures located at the **Acquired Business** or otherwise used or held for use in connection with the Acquired Business as of the Closing Date, as set forth on Schedule 2.1(a);

(b)  all of Seller's inventory located on the **Acquired Business** or otherwise used or held for use in connection with the Acquired Business as of the Closing Date, including, without limitation, fresh, frozen and dry foods and ingredients and liquor, beer and other beverages (the "**Inventory**"), as determined by the physical inventory referenced and scheduled in Section 3.1(b)(i) below;

(c)     all Supplies and other tangible and intangible personal property located at the Restaurants or otherwise used or held for use in connection with the Acquired Business as of the Closing Date, including, without limitation,  computer hardware and software;

(d)     all of the books, records, manuals, documents, equipment supplier lists, customer lists and similar information to the extent relating to the Acquired Business;

(e)     to the extent transferable, all franchises, licenses, permits, consents and certificates issued by governmental authorities to or held by Seller to the extent related to the Acquired Business, including, without limitation, Seller's liquor licenses and such other licenses and permits identified on Schedule 2.1(e) attached hereto; and

2.2     Excluded Assets.

There shall be excluded from the Assets to be Acquired and, to the extent in existence on the Closing Date, Seller shall retain all of Seller's right, title and interest in and to the following assets (collectively, the "**Excluded Assets**"):

(a)     the corporate seal, articles of incorporation, minute books, stock books, Tax returns, books of account and other records having to do with the corporate organization of Seller;

(b)     all of the cash, cash equivalents, bank accounts, deposits, lock boxes and other similar accounts (whether maintained at a bank, savings and loan or other financial institution), marketable securities, including petty cash;

(c)     all accounts receivable, refunds, rebates and investments of Seller with respect to the Acquired Business prior to the Closing Date;

(d)     all of Seller's rights, title and interest in and to any patents, trademarks, trade secrets, menus, menu ingredients, service marks, trade names or other intellectual property and goodwill related thereto owned by Seller and used in connection with the Acquired Business, including, without limitation, the name "Damon's and Damon's Grille" and the domain name "www.damons.com" and  such other items identified on Schedule 2.2(d) attached hereto.

(e)     all refunds or credits for Taxes related to the Acquired Business or Seller's assets for taxable periods prior to and including the Closing Date;

(f)     all insurance policies, rights thereunder and prepaid expenses relating thereto; and

(g)     any permits, franchises and licenses to the extent not lawfully transferable;

(h)     any assets of any Plan (as defined below), including, without limitation, the right to receive any assets of any such Plan in accordance with applicable law;

(i)     any personnel files and employee medical records, together with any other books and records, in each case the provision of which to Buyer would violate any applicable law;

(j)     all leased assets and rights related thereto, to the extent that Buyer does not assume the corresponding lease obligations at Closing; and

(k)     all rights, claims and defenses in any way pertaining to any cause of action, litigation, proceeding or the like which are pending or otherwise accrued prior to the Closing Date (whether known or unknown).

2.3     <u>Assumption of Seller's Liabilities and Obligations</u>.

It is agreed that all liabilities and/or obligations of Seller will remain the obligation of Seller. Buyer shall not assume or be obligated for any other liability, obligation or commitment of Seller arising, directly or indirectly by Seller whether known or unknown, absolute or contingent, to include, but not limited to, the following (collectively, the "**Seller's Retained Liabilities**"):

(a)     any Taxes;

(b)     any liability, obligation or commitment of Seller to its customers (excluding Gift Certificate redemption), owners or creditors (secured or unsecured), whether arising out of Contract, warranty, tort, or otherwise, whether contingent or off balance sheet, or to any party holding a Lien on any of Seller's assets;

(c)     any employee obligation, including any obligation for wages, salaries, commissions, vacation and holiday pay, compensation time or pay, sick pay, bonuses, severance pay, workers' compensation liabilities, pensions, profit sharing payments, or employment at-will relationship;

(d)     any liability, obligation or commitment incurred by Seller, whether before or after the Closing Date;

(e)     any liability the existence of which would constitute a breach of any of the representations, warranties or covenants of Seller in this Agreement;

(f)     any liability arising because Hazardous Materials are present on any real property used by Seller due to the acts or omission of Seller or any liability for the use, handling, generation or disposal of Hazardous Materials caused by or attributed to Seller;

(g)     any insurance liability of Seller incurred on or prior to the Closing Date, whether reported or unreported; or

(h)     any other liability, obligation or commitment not expressly assumed by Buyer pursuant to this Agreement.

## 3.      **TOTAL CONSIDERATION AND CLOSING**

3.1      Total Consideration.

(a)      Total Consideration.  Subject to Section 3.1(b), the total monetary consideration payable by Buyer in consideration for Seller's transfer of the Assets to be Acquired at the Closing  (the "**Total Consideration**") shall be  the value of the Inventory determined pursuant to (b) below, and the following:

(i)      $12,000.00 for each location acquired by Buyer.

(b)      Inventory and Supplies.

(i)      No earlier than three (3) days immediately preceding the scheduled Closing Date, designees of Seller and Buyer shall jointly conduct a physical inventory of the Inventory and Supplies.  The purpose of such physical inventory shall be to document the nature and amount of Inventory and Supplies that will exist as of the Closing Date.

(ii)      It is specifically agreed between Seller and Buyer that on the Closing Date, Seller will have on hand in each Restaurant, in stock as part of the Assets to be Acquired, Inventory and Supplies to enable Buyer to operate a full service/operation restaurant in the normal course of business.

(iii)      Buyer shall pay Seller an amount equal to the value of the Inventory on hand as of the closing date ("Inventory Value") to Seller in immediately available funds within five (5) calendar days after final determination.

3.2      Closing Date and Location.

(a)      Unless otherwise mutually agreed to by the parties and subject to the satisfaction or waiver of the conditions set forth in Articles 7 and 8, the consummation of the transactions contemplated by this Agreement (the "**Closing**") will take place at 1:00 p.m., local time, at the offices of Blumling & Gusky, LLP, 1200 Koppers Building, 436 Seventh Avenue, Pittsburgh, PA 15219 on the 15th day of September, 2011.

(b)      All items of prepaid and/or accrued income and certain expenses to include utilities will be prorated between Buyer and Seller as of Closing.

## 4.      **REPRESENTATIONS, WARRANTIES AND COVENANTS OF SELLERS**

As an inducement to Buyer to enter into this Agreement and to consummate these transactions, Seller represents and warrants and to Buyer as follows:

4.1      Organization of Seller.

Seller is a corporation duly incorporated and organized, validly existing and in good standing under the laws of the State of Ohio, and has the requisite power and authority to own or

lease all of the Assets to be Acquired, to own and operate the Acquired Business as such is currently operated. Seller is a licensed restaurant operator in the Commonwealth of Pennsylvania and State of Ohio.

4.2     Authority of Seller.

Subject to Bankruptcy Court Approval, Seller has the power to enter into and perform its obligations pursuant to this Agreement. Seller's execution, delivery and performance of this Agreement, and each other agreement or instrument contemplated hereby to which Seller is a party, and the transfer to Buyer of the Assets to be Acquired hereunder has been duly authorized by all requisite action on the part of Seller. This Agreement and each other agreement or instrument contemplated hereby to which Seller is a party will be, the legal, valid and binding agreement of Seller, enforceable against Seller in accordance with their respective terms. Except as set forth on Schedule 4.2, the execution, delivery and performance of this Agreement and the other agreements of Seller contemplated by it do not require any further authorization or the consent of or notice to any third party. Except as set forth on Schedule 4.2, neither the execution and delivery of this Agreement nor the consummation of these transactions will conflict with or result in any violation of or constitute a default under any term of the Articles of Incorporation or Bylaws of Seller, or any agreement, mortgage, debt instrument, indenture, or other instrument, judgment, decree, order, award, law or regulation by which Seller is bound, or result in the creation of any lien, security interest, charge or encumbrance upon any of the Assets to be Acquired.


4.3     Title to Personal Property.

Seller will have at the Closing good and marketable title to all of the Assets to be Acquired, which will be transferred to Buyer, free and clear of all liens, claims, charges, encumbrances, leases, pledges, security interests, mortgages, defects in title, equities, covenants and other restrictions of any nature whatsoever other than any contracts Buyer expressly assumes prior to Closing. Seller owns each of the Assets to be Acquired in fee title and not under lease.

4.4     Compliance with Laws; Litigation.

(a)     Seller has filed all reports, schedules and/or returns of any administrative agency of the federal or any state or local government required to be filed by Seller in connection with its operation of the Acquired Business.

(b)     There is no action, suit or proceeding pending or, to the Knowledge of Seller, threatened which questions the legality or propriety of the transactions contemplated by this Agreement.

4.5     Condition of Assets.

(a)     Buyer has inspected the Assets to be acquired, and is aware of the condition of the Assets to be acquired.

(b)     All of the Inventory was purchased in the ordinary course of business and none of the Inventory is obsolete or expired.  Seller shall deliver to Buyer Supplies and Inventory on hand in each of the Restaurants.

(c)     Except with respect to the warranties and representations specifically set forth in this Agreement, Seller makes no warranty, express or implied, whether of merchantability, suitability or fitness for a particular purpose, or quality as to the Assets to be Acquired, or any part thereof, or as to the condition or workmanship thereof, or the absence of any defects therein, whether latent or patent, it being understood that the Assets to be Acquired are to be conveyed hereunder "AS IS, WHERE IS, WITH ALL FAULTS" subject only to Seller's express representation and warranties contained herein.

4.6     Broker or Finder.

Neither Seller nor any party acting on Seller's behalf has paid or become obligated to pay any fee or commission to any broker, finder or intermediary for or on account of the transactions contemplated by this Agreement, except for NHB Advisors, Inc.

4.7     Labor Relations.

The employees of Seller are not parties to any collective bargaining agreement with Seller.  To the Knowledge of Seller, there are no grievances, disputes or controversies with any union or any other organization of Seller's employees, nor, to the Knowledge of Seller, are there any threats of strikes, work stoppages or any pending demands for collective bargaining by any union or organization.  No unfair labor practice charges or complaints (relating to the Acquired Business) are pending against Seller.  Seller has not received written notice of the intent of any federal, state or local governmental authority responsible for the enforcement of labor or employment laws to conduct an investigation with respect to or relating to the Acquired Business and no such investigation is in progress.

4.8     Contracts.

Seller is not a party to any agreement or instrument nor subject to any restriction which now has or, to the Knowledge of Seller, may have a material adverse effect, financial or otherwise, upon Seller, the Acquired Business or the Assets to be Acquired.

4.9     Options, Warrants and Rights of First Refusal.

No other person or entity has any option, warrant or right of first refusal to purchase the Assets to be Acquired or the Acquired Business from Seller.

4.10    Environmental Matters.

Except as disclosed on Schedule 4.10, to the Knowledge of Seller, Seller has never, in connection with the Acquired Business or Assets to Acquired, owned, operated or leased any property that has used, generated, stored or disposed of any Hazardous Materials other than in compliance with applicable law, nor, to the Knowledge of Seller, have there been any Hazardous Materials disposed of by any previous owner or any other third party on any

property owned, operated or leased by Seller in connection with the operation of the Acquired Business.

4.11    Employee Benefit Plans.

Schedule 4.11 sets forth all current employee benefit plans (within the meaning of Section 3(3) of Employee Retirement Income Security Act of 1974, as amended "**ERISA**") and all bonus, stock option, stock purchase, restricted stock, incentive, deferred compensation, retiree medical, dental or life insurance, supplemental retirement, severance or other benefit plans, programs or arrangements, and all employment, termination, severance or other contracts or agreements to which Seller is a party or with respect to which Seller has or could have any obligation (whether primary or secondary), all to the extent related to the Acquired Business (collectively, the "**Plans**").  Buyer shall accept no assets of the Plans, and shall assume no liabilities with respect to the Plans.

4.12    Chief Place of Business.

Seller's chief place of business is 200 East Campus View Blvd., Suite 200, Columbus, OH 43231.

4.13    Operations of Business Prior to Closing.

Seller will continue to operate its business as a regular ongoing entity in accordance with current operations and Section 6.4.

**5.    REPRESENTATIONS, WARRANTIES AND COVENANTS OF BUYER**

As an inducement to Seller to enter into this Agreement and to consummate these transactions, Buyer represents, warrants and covenants to Seller and agrees that as of this date and through and including the Closing Date as follows:

5.1    Organization and Authority of Buyer.

Buyer is a corporation, duly incorporated and organized, validly existing and in good standing under the laws of _____. Buyer has full corporate power and authority to enter into this Agreement, to consummate the transactions contemplated hereby and to comply with the terms, conditions and provisions hereof.  This Agreement is, and each other agreement or instrument of Buyer contemplated by it will be, the legal, valid and binding agreement of Buyer, enforceable against Buyer in accordance with its terms.  Buyer's board of directors has approved Buyer's purchase of the Assets to be Acquired. The execution, delivery and performance of this Agreement and the other agreements of Buyer contemplated by it do not require any further authorization, or the consent of or notice to any third party, and do not conflict with or contravene any charter documents or agreements binding upon Buyer or its assets.

5.2     Broker or Finder.

Neither Buyer nor any party acting on its behalf has paid or become obligated to pay any fee or commission to any broker, finder or intermediary for or on account of these transactions.

5.3     Litigation.

There is no claim, action, proceeding or investigation pending or, to the actual knowledge of Buyer, threatened, nor is there any outstanding writ, order, decree or injunction that (a) calls into question Buyer's authority or right to enter into this Agreement and consummate the transactions contemplated hereby, or (b) would otherwise prevent or delay the transactions contemplated by this Agreement.

## 6.     COVENANTS

The parties covenant and agree to take the following actions:

6.1     Investigation and Confidentiality.

(a)     Until the Closing or earlier termination of this Agreement, Seller will afford Buyer and its representatives with access during normal business hours to the properties, facilities, equipment, and books and records of Seller.  Seller acknowledges that Buyer also desires to contact Seller's employees and suppliers with prior specific coordination and cooperation of Seller and Seller's option to have a Seller representative present.  Seller agrees to coordinate the contact of employees and cooperate with Buyer in making such timely contact, in order that Buyer will have full opportunity to investigate the business affairs of Seller.  Prior to any visit to Seller's properties or any written or verbal communication with Seller's personnel, vendors, customers or suppliers, Buyer shall give forty-eight (48) hours notice to Seller of Buyer's intent to undertake such visit or communications and Seller agrees to cooperate and assist with the coordination of Buyer's investigation and to facilitate Buyer's communications with Seller's personnel, vendors, customers and suppliers; provided that Buyer will cooperate in good faith to minimize the disruption to Seller's business

6.2     Preservation of Representations and Warranties.

(a)     Seller and Buyer will each refrain from knowingly taking any action which would render untrue any representation, warranty or covenant contained in this Agreement, and will not knowingly omit to take any action, the omission of which would render untrue any such representation, warranty or covenant.  Promptly upon the occurrence of, or promptly upon such party becoming aware of the impending or threatened occurrence of, any event which would cause any of the representations or warranties of such party contained herein, or in any Schedule or Exhibit, to be materially inaccurate, such party will give detailed written notice thereof to the other party.

(b)     Buyer and Seller will promptly notify the other party of any action, suit or proceeding that will be instituted or threatened against such party to restrain, prohibit or

otherwise challenge the legality of any of the transactions contemplated by this Agreement. Seller will promptly notify Buyer of any lawsuit, claim, proceeding or investigation that may be threatened, brought, asserted or commenced against Seller, and of any damage, destruction or other casualty, whether or not insured, to the Assets to be Acquired.

6.3     Lien Searches.

Buyer, at Buyer's expense, will perform lien searches against Seller, Seller's owner, and any fictitious names identified and used by Seller, and Buyer shall promptly deliver copies of the results of all such lien searches to Seller.

6.4     Maintenance of Business.

(a)     Subject to the terms and conditions of this Agreement and except as otherwise contemplated hereby, Seller shall, from the date hereof through the Closing Date or the earlier termination of this Agreement:

(i)     continue to operate the Acquired Business, maintain the Assets to be Acquired and keep all of Seller's business books, records and files all in the ordinary course of business in accordance with past practices consistently applied; provided, however, that Seller may adjust Inventory purchasing as contemplated under Section 3.1(b) and may return any leased assets that are subject to leases not being assumed by Buyer at Closing. Prior to Closing, Seller will not sell except in the ordinary course of Seller's business, transfer, assign or permit the creation of any lien, charge or encumbrance on any of the Assets to be Acquired. Seller will not permit the amendment or modification of any of the Assumed Contracts without the prior written consent of Buyer. Seller will not enter into any material contract or commitment nor incur any indebtedness or other liability or obligation of any kind relating to the Acquired Business that is not in the ordinary course of business without the prior written consent of Buyer. Seller will (i) refrain from entering into any transaction with respect to the Acquired Business not in the ordinary course of business that will survive the Closing without the prior written consent of Buyer; and (ii) use its reasonable efforts to preserve generally the goodwill of customers, suppliers, vendors, employees and creditors and others having business relations with the Acquired Business.

6.5     Insurance.

Until Closing, Seller will maintain in full force and effect all currently existing insurance policies to cover Seller's general liability and protect the Restaurants and the Assets to be Acquired against damage or destruction.

6.6     Organization and Transition.

To the extent not inconsistent with Section 6.4, Seller will use all reasonable efforts consistent with sound business judgment to preserve intact Seller's present business or organization, to retain the services of Seller's present employees, to preserve Seller's relationships with customers, suppliers and others having business relationships with Seller and to maintain the goodwill enjoyed within the areas served by the Acquired Business. Seller agrees to deliver to Buyer all information reasonably requested by Buyer. Seller will deliver or

otherwise make available copies of all of the contracts and all files and documents relating thereto to Buyer immediately upon execution of this Agreement.

6.7    Consummation of Agreement.

Seller and Buyer agree to use reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to consummate and make effective as promptly as practicable the transactions contemplated by this Agreement and to cooperate with the other in connection with the foregoing, including using reasonable efforts to:

(a)    obtain all necessary waiver, consents, releases and approvals from other parties to the transfer of the Assigned Contracts and any transferable permits or licenses (including the liquor license);

(b)    obtain all consents, approval and authorization that are required to be obtained;

(c)    lift or rescind any injunction or restraining order or other order adversely affecting the ability of the parties hereto to consummate the transactions contemplated hereby;

(d)    to effect all necessary registrations and filings and submissions of information properly requested by any governmental authority; and

(e)    to fulfill all conditions to this Agreement.

6.8    Employees.

Promptly upon execution hereof, Seller shall give all notices and take all actions required under all federal, state and municipal statutes, laws, ordinances and regulations applicable to plant or facility closings, shut downs or employee terminations.  Buyer may interview and offer employment to some of Seller's employees but is not obligated to do so. Seller is solely responsible for all obligations to its employees, including all payroll, bonus, severance and vacation sums to which they are legally entitled.  No employee of Seller will automatically become an employee of Buyer as a result of these transactions.

6.9    Further Assurances.

Seller and Buyer agree that, from time to time, at or after the Closing Date, each of them will execute and deliver such further instruments of conveyance and transfer and take such other action as may be reasonably necessary to carry out the purpose and intent of this Agreement and to put Buyer in actual possession and control of all the Assets to be Acquired.

6.10    Public Announcements.

Neither Buyer nor Seller will, without the approval of the other party (which may not be unreasonably withheld), make any press release or other public announcement concerning the transactions contemplated by this Agreement, except as and to the extent that such party is obligated to do so by applicable law, in which case the other party will be advised and Buyer and

Seller will use their reasonable efforts to cause a mutually agreeable release or announcement to be issued.

6.11    No Implied Representations.

It is the explicit intent of each party hereto that none of Buyer, Seller or any of their respective affiliates, employees or representatives are making any representations or warranties whatsoever, express or implied, beyond those expressly given in this Agreement.

6.12    Accounts Receivable, Refunds and Rebates.

Seller will designate an account and Buyer will forward to same any accounts receivable, refunds or rebates received by Buyer after the Closing Date that are included in the Excluded Assets and shall forward all such amounts to Seller on a monthly basis up to twelve (12) months from Closing Date.

6.13    Liquor License.

As part of the consideration of the Total Consideration, Buyer is purchasing the liquor licenses listed in Schedule 2.1(e).

6.14    Updating Schedules.

Seller shall update the schedules hereto at Closing to reflect actions taken by Seller or events occurring after the date of this Agreement or to make any non-material corrections to items already appearing on such schedules, provided that (a) such updates shall relate only to actions taken by Seller that are permitted pursuant to this Agreement, and (b) no such update shall be deemed to cure any breach which exists as of the date of this Agreement.

7.    **CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER**

On or prior to the Closing Date, Seller will have satisfied (or caused to be satisfied) each of the following conditions, unless waived in writing by Buyer:

7.1    Covenants and Warranties.

There will have been no breach by Seller in the performance of any of Seller's material covenants and agreements contained in this Agreement that have not been cured by Closing (if capable of cure), each of the representations and warranties of Seller contained or referred to in this Agreement will be true and correct in all material respects on the Closing Date as though made on the Closing Date, except for changes therein specifically permitted or contemplated by this Agreement or resulting from any transaction expressly consented to in writing by Buyer and except for any representation that speak as of a specific date or time other than the Closing Date (which need only be true and correct in all material respects as of such date or time). All of the covenants and agreements of Seller to be performed on or before the

Closing Date in accordance with this Agreement shall have been duly performed in all material respects.

7.2     No Restraint or Litigation.

(a)     At the Closing Date, no injunction, ruling, restraining order or decree of any nature of any court or governmental authority shall be in effect which (i) prevents the consummation of any of the transactions contemplated hereby, or (ii) could cause any of the transactions contemplated by this Agreement to be rescinded following consummation.

(b)     (i) No claim, action, suit, arbitration, investigation, inquiry or other proceeding by or before any court or governmental authority or by any other person shall be pending; or (ii) no party to this Agreement shall have been advised by any governmental authority (which advisory has not been officially withdrawn by such agency or authority on or prior to the Closing Date) that such agency or authority is investigating the transactions contemplated by this Agreement to determine whether to file or commence any litigation or action, which, in the case of either (i) or (ii) above, seeks or would seek to enjoin, restrain or prohibit the consummation of the transactions contemplated by this Agreement, or to impose limitations on the ability of Buyer to continue operation of the Acquired Business as presently conducted with Assets to be Acquired, or to require divestiture by Buyer of the Assets to be Acquired.


7.3     Adverse Change.

There will not have occurred any material adverse change to Seller or the Acquired Business or in the condition of the Assets to be Acquired.

7.4     Documents, Certificates and Other Items.

Seller will have the following duly executed and delivered or caused to be delivered to Buyer:

(a)     an Assignment and Bill of Sale;

(b)     Certificates of Good Standing issued by appropriate government official of the State of Pennsylvania evidencing Seller's good standing in such state, dated within 30 days of the Closing Date;

(c)     Such assignments, bills of sale, certificates of title and other instruments of transfer, each in a form reasonably acceptable to the parties, as are necessary to convey the Assets to be Acquired to Buyer in accordance with the terms hereof;

(d)     Seller and Buyer shall enter into a Franchise Agreement in form and substance acceptable to Seller and Buyer;

(e)     Buyer shall have entered into a lease or prime landlord approved sublease for each of the Restaurants in form and substance acceptable to Buyer; and

(f)     Such other and further certificates, assurances and documents as may reasonably be required by Buyer in connection with the consummation of the transactions contemplated by this Agreement.

## 7.5     Bankruptcy Court Approval.

(a)     Seller will have delivered to Buyer an order of the United States Bankruptcy Court approving this transaction and releasing any Liens or claims which any secured or unsecured creditors of Seller has or could have against the Assets to be Acquired, and causing the termination of any Liens on file against any of the Assets to be Acquired

## 7.6     Consents and Approvals.

Buyer shall have obtained all the consents or approvals of any third party and any governmental authority that are required to be obtained by Buyer in order to consummate the transactions contemplated herein.

## 8.     CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

On or prior to the Closing Date, Buyer will have satisfied each of the following conditions unless waived in writing by Seller:

## 8.1     Covenants and Warranties.

The representations and warranties of Buyer contained in this Agreement will be true and correct on the Closing Date as though made on the Closing Date, except for changes therein specifically permitted by this Agreement or resulting from any transaction expressly consented to in writing by Seller and except for any representations and that speak as of a specific date or time other than the Closing Date (which need only be true and correct in all material respects as of such date or time).  All of the covenants and agreements of Buyer to be performed on or before the Closing Date in accordance with this Agreement shall have been duly performed in all material respects.

## 8.2     Delivery of Total Consideration

Buyer will have delivered the Total Consideration in accordance with Section 3.2.

## 8.3     Documents, Certificates and Other Items.

Buyer will have the following duly executed and delivered or caused to be delivered to Seller:

(a)     counterparts to such assignment and assumption agreements as may be necessary to assign to Buyer all of Seller's rights and interests under the Assigned Contracts and to evidence Buyer's assumption of the Assumed Liabilities associated therewith, each in a form reasonably acceptable to the parties;

(b)    copies of the resolutions adopted by its board of directors authorizing the execution and delivery of this Agreement and the performance of the transactions contemplated hereby, certified by the Secretary of the Buyer;

(c)    Such other and further certificates, assurances and documents as may reasonably be required by Seller in connection with the consummation of the transactions contemplated by this Agreement.

8.4    <u>No Restraint or Litigation</u>.

(a)    At the Closing Date, no injunction, ruling, restraining order or decree of any nature of any court or governmental authority shall be in effect which (i) prevents the consummation of any of the transactions contemplated hereby, or (ii) could cause any of the transactions contemplated by this Agreement to be rescinded following consummation.

(b)    (i) No claim, action, suit, arbitration, investigation, inquiry or other proceeding by or before any court or governmental authority or by any other person shall be pending; or (ii) no party to this Agreement shall have been advised by any governmental authority (which advisory has not been officially withdrawn by such agency or authority on or prior to the Closing Date) that such agency or authority is investigating the transactions contemplated by this Agreement to determine whether to file or commence any litigation or action, which, in the case of either (i) or (ii) above, seeks or would seek to enjoin, restrain or prohibit the consummation of the transactions contemplated by this Agreement, or to require divestiture by Seller of the Total Consideration or any part thereof.

8.5    <u>Consents and Approvals</u>.

Seller shall have obtained all the consents or approvals of any third party and any governmental authority that are required to be obtained by Seller in order to consummate the transactions contemplated herein.

## 9.    <u>DAMAGE TO PROPERTY AND RISK OF LOSS</u>

The risk of any loss or damage to the Assets to be Acquired and the Acquired Business resulting from fire, theft or any other casualty (except reasonable wear and tear) will be borne by Seller at all times prior to 11:59:59 p.m. on the Closing Date.  In the event that any such loss or damage will be sufficiently substantial so as to preclude and prevent resumption of normal operations of any material portion of the Acquired Business within 30 days from the occurrence of the event resulting in such loss or damage, Seller will immediately notify Buyer in writing of its inability to resume normal operations or to replace or restore the lost or damaged property, and Buyer, at any time within 10 days after receipt of such notice, may elect either: (a) to waive such defect and proceed toward consummation of these transactions in accordance with the terms of this Agreement, or (b) to terminate this Agreement.  If Buyer elects to terminate this Agreement pursuant to this Section, the parties will be fully released and discharged of any and all obligations under this Agreement, except for the ongoing duty of confidentiality.  If Buyer elects to consummate this transaction despite such loss or damage and

does so, there will be no diminution of the Purchase Price on account of such loss or damage and all insurance proceeds payable as a result of the occurrence of the event resulting in loss or damage to the property, less the amount of one-half of any deductible for such insurance coverage, will be delivered to Buyer, or the rights thereto will be assigned to Buyer if not yet paid over to Seller.

## 10.    TERMINATION OF AGREEMENT
### 10.1    Termination.

This Agreement may be terminated:

(a)    at any time prior to the Closing by the mutual written consent of Seller and Buyer;

(b)    by Seller, in its sole discretion, in the event that the Closing has not taken place on or before September 30, 2011, for any reason other than Seller's willful failure to use reasonable efforts to satisfy a condition precedent to Buyer's obligation to proceed with the Closing;

(c)    by Buyer, in its sole discretion, in the event that the Closing has not taken place on or before September 30, 2011, for any reason other than Buyer's willful failure to use reasonable efforts to satisfy a condition precedent to Seller's obligation to proceed with the Closing; or

### 10.2    Procedure and Effect of Termination.

In the event of termination of this Agreement pursuant to Section 10.1, written notice thereof shall be given by the terminating party to the other party hereto, and this Agreement shall thereupon terminate and become void and have no effect, and the transactions contemplated hereby shall be abandoned without further action by the parties hereto, except that the provisions of Article 11 and shall survive the termination of this Agreement.

## 11.    GENERAL PROVISIONS

### 11.1    Survival of Obligations.

Seller and Buyer acknowledge that the representations, warranties, covenants and agreements of Seller and Buyer contained in this Agreement form an integral part of the consideration given to Buyer in exchange for the Purchase Price and to Seller in exchange for the Acquired Business without which Buyer would be unwilling to purchase, and Seller would be unwilling to sell, the Assets to be Acquired.   Seller and Buyer agree that all of the representations, warranties, covenants and agreements of Seller and Buyer contained in this Agreement will survive the making of this Agreement and the Closing.

### 11.2    Transfer Charges and Taxes.

Seller shall pay all stamp, sales, income, or other taxes, federal, state or local imposed by law in respect of any and all other transfers pursuant to this Agreement.

11.3    Governing Law.

        This Agreement will be governed by, and construed and enforced in accordance with, the laws of the State of Ohio, without regard to its conflicts of law provisions.

11.4    Notices.

        All notices or other communications required or permitted hereunder will be in writing and will be deemed given when delivered personally, by registered or certified mail, by legible facsimile transmission or by overnight courier (fare prepaid) addressed as follows:

If to Buyer, to:                                with a copy to:




If to Seller, to:                               with a copy to:

Damon's Restaurants, Inc.                       Michael Kaminski, Esquire
930 Glenwood Avenue                             Blumling & Gusky, LLP
Ambridge, PA 15003                              1200 Koppers Building
                                                436 Seventh Avenue
                                                Pittsburgh, PA 15219

or to such address as such party may indicate by a notice delivered to the other parties hereto. Notice will be deemed received the same day (when delivered personally), 5 days after mailing (when sent by registered or certified mail) and the next business day (when delivered by overnight courier or by facsimile transmission).

11.5    Assignment.

        This Agreement may not be assigned by Seller without the prior written consent of Buyer.  Buyer will have the right to assign this Agreement and the rights and obligations hereunder to an affiliate prior to Closing without the prior written consent of Seller; provided that Buyer provides Seller with reasonable advance notice of any such assignment and provided that no other assignment shall be permitted without the Seller's prior written consent.

11.6    Entire Agreement; Amendments.

        This Agreement is an integrated document, contains the entire agreement between the parties, wholly cancels, terminates and supersedes any and all previous and/or contemporaneous oral agreements, negotiations, commitments and writings between the parties hereto with respect to such subject matter  No change, modification, extension, termination, notice of termination, discharge, abandonment or waiver of this Agreement or any of its

provisions, nor any representation, promise or condition relating to this Agreement, will be binding upon any party unless made in writing and signed by such party.

11.7   Headings.

Article titles and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of any of the provisions of this Agreement.  All references to Sections and subsections contained in this Agreement refer to the Sections and subsections of this Agreement.  All references to Schedules or Exhibits contained in this Agreement are references to the Schedules or Exhibits described on the list immediately following the signature page hereto.  All references to the words "include" or "including" mean "including without limitation."  Any and all Schedules, Exhibits, statements, reports, certificates or other documents or instruments referred to in or attached to this Agreement are incorporated by reference as though fully set forth at the point referred to in this Agreement.  There will be no presumption against any party on the ground that such party was responsible for preparing this Agreement or any part of it.  All pronouns and any variations thereof will be deemed to refer to the masculine, feminine, neuter, singular or plural as the context may require.

11.8   Waivers.

Any term or provision of this Agreement may be waived, or the time for its performance may be extended, by the party or parties entitled to the benefit thereof, but any such waiver must be in writing and must comply with the notice provisions contained in Section 12.3. The failure of any party to enforce at any time any provision of this Agreement will not be construed to be a waiver of such provision, nor in any way to affect the validity of this Agreement or any part of it or the right of any party thereafter to enforce each and every such provision.  No waiver of any breach of this Agreement will be held to constitute a waiver of any other or subsequent breach.

11.9   Expenses.

Except as otherwise provided in this Agreement, Buyer and Seller will each pay all costs and expenses incident to its negotiation and preparation of this Agreement and to its performance and compliance with all agreements and conditions on its part to be performed or complied with, including the fees, expenses and disbursements of its counsel and accountants.

11.10   Partial Invalidity.

Wherever possible, each provision will be interpreted in such manner as to be effective and valid under applicable law, but in case any one or more of these provisions will, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability will not affect any other provisions of this Agreement, and this Agreement will be construed as if such invalid, illegal or unenforceable provision or provisions had never been contained herein, unless the deletion of such provision or provisions would result in such a material change as to cause the completion of these transactions to be unreasonable.

11.11    Further Assurances.

From time to time following the Closing Date, Seller will: (a) at the request and expense of Buyer and without further consideration, execute and deliver to Buyer such other instruments of conveyance and transfer as Buyer may reasonably request or as may be otherwise necessary to more effectively convey and transfer to, and vest in, Buyer and put Buyer in possession of, any part of the Assets to be Acquired.  In the case of any agreement, contract, lease, easement or other commitment which is included in the Assets to be Acquired  but which cannot be transferred or assigned effectively without the consent of a third-party, whose consent has not been obtained prior to Closing, Seller will cooperate with Buyer at Buyer's request for up to 60 days after the Closing Date in trying to promptly obtain such consent.

11.12    Counterparts.

This Agreement may be executed in one or more counterparts, each of which will be considered an original instrument and all of which together will be considered one and the same agreement, and will become effective when counterparts, which together contain the signatures of each party hereto, will have been delivered to Buyer and Seller.  Delivery of executed signature pages by facsimile transmission will constitute effective and binding execution and delivery of this Agreement.

11.13    Third Party Beneficiaries.

This Agreement will not confer any rights or remedies upon any person other than the parties to this Agreement and their respective successors and permitted assigns

11.14    Good Faith.

Buyer and Seller each acknowledge and agree that there is an implied covenant of good faith and fair dealing on their behalf in connection with the transactions contemplated by this Agreement.

*[Signatures appear on following page*

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first above written.


<u>SELLER</u>:                                        <u>BUYER</u>:


By:_____        By:_____

## List of Schedules

| | |
|---|---|
| 2.1(a) | Furniture, Fixtures & Equipment |
| 2.1(e) | Licenses and Permits |
| 2.2(d) | Intellectual Property |
| 4.2 | Limitations on Authority of Seller |
| 4.10 | Hazardous Materials Disclosure |
| 4.11 | Employee Benefit Plans |

## List of Exhibits

| | |
|---|---|
| A | Restaurants |

**SCHEDULE 2.1(a)**

**FURNITURE, FIXTURES & EQUIPMENT**

**Sandusky Store**

| Quantity | Item Description |
|---|---|
| 7 | POS Terminals (note manufacturer/s) |
| 4 | POS Cash Drawers |
| 11 | Chit Printers |
| 2 | BOH Computer |
| 1 | Computer Networking Hardware (note item/s) |
| 1 | Computer Printer |
| 2 | Guest Pagers & Charger |
| 1 | CRT Televisions |
| 3 | Plasma Televisions |
| 1 | Safe |
| 13 | 24" x 24" 2-top tables |
| 2 | 24" x 30" 2-top tables |
| 39 | 48" x 30" 4-top tables |
| 10 | 72" x 30" 6-top tables |
| 2 | Round Tables (all) |
| 68 | Wooden Chairs |
| 24 | Wooden Bar Stools |

| | |
|---|---|
| 8 | coushin bar chairs |
| 4 | Patio Tables |
| 20 | Patio Chairs |
| 1 | Hand Sink |
| 1 | 3 Compartment Sink |
| 2 | Soda Gun/s |
| 1 | Stainless Steel Drainboard |
| 2 | Blender |
| 1 | Glass Door Refrigerator |
| 1 | Glass or Mug Froster |
| 1 | Draft Beer System |
| 1 | Glass Washer |
| 1 | 36" Char Broiler |
| 1 | 60" Char Broiler |
| 1 | Flat Top Griddle |
| 1 | Range (note qty of burners) |
| 1 | Multi Vat Fryer System (note vat qty.) |
| 2 | Double Stack Convection Oven |
| 4 | Drawer Warmer |
| 1 | Salamander/Cheesemelter |
| 2 | Slicer |

| | |
|---|---|
| 1 | Rib Cooler (note 27" or 48") (Damon's Only) |
| 2 | 27" Sandwich Prep Table (fits 2 hotel pans) |
| 2 | 48" Sandwich Prep Table (fits 3 hotel pans) |
| | 60" Sandwich Prep Table (fits 4 hotel pans) |
| | 72" Sandwich Prep Table (fits 5 hotel pans) |
| 1 | Upright Freezer (fry side) |
| 1 | 5 Pan Steam Well |
| 3 | Alto Shaam (cook and hold) |
| 2 | Server Shelf Heat Lamps |
| 2 | Counter Top Hot Well |
| 3 | Standard Microwave |
| 1 | Ice Cream Dipping Cabinet |
| 2 | Dipper Wells |
| 1 | Single Door Upright Desert Refrigerator |
| 1 | Ice Maker |
| 1 | Ice Maker Bin |
| 1 | Ice Maker Water Filter/s |
| 1 | 2 Compartment Sink/s (prep) |
| 1 | Work Tables (prep) |
| 10 | Stainless Steel Wall Shelves |
| 1 | Wire Dry Storage Shelving |

| | |
|---|---|
| 4 | Dunnage Rack/s |
| 1 | Hand Sink/s |
| 1 | Coffee Brewer/s |
| 2 | Tea Brewer/s |
| 2 | Post Mix Dispenser (with ice bin) |
| 1 | Soiled Dish Table |
| 1 | Clean Dish Table |
| 1 | Pot Sink |
| 1 | Pre-Rinse Hose and Sprayer |
| 1 | Dish Washer |
| 13 | Dish Racks |
| 1 | Walk In Cooler Freezer |
| 3 | Freezer Shelving |
| 5 | Speed Racks |
| 11 | Clean Glass Racks |

**<u>Mentor Store</u>**

| | |
|---|---|
| 6 | POS Terminals (note manufacturer/s) |
| 3 | POS Cash Drawers |
| 12 | Chit Printers |
| 2 | BOH Computer |
| 1 | Computer Networking Hardware (note item/s) |

| | |
|---|---|
| 1 | Fax Machine |
| 1 | Computer Printer |
| 5 | DirecTV Receivers (note std. or hi-definition) |
| 1 | Touch Screen Controller (Damon's Only) |
| 1 | Amplifier (Damon's Only) |
| | Matrix Switch (Damon's Only) |
| 6 | VCR (Damon's Only) |
| 1 | Music On Hold (note brand) |
| 31 | NTN Buzztime Playmakers (Damon's Only) |
| 45 | Table Top Speakers (Damon's Only) |
| 4 | Guest Pagers & Charger |
| 7 | Projectors (Damon's Only) |
| 4 | Projection Screens (Damon's Only) |
| 4 | Projector Bulbs (Damon's Only) |
| 14 | CRT Televisions |
| 1 | Safe |
| 3 | 36" x 36" 4-top tables |
| 5 | 48" x 30" 4-top tables |
| 5 | 72" x 30" 6-top tables |
| 75 | Wooden Chairs |
| 18 | Wooden Bar Stools |

| | |
|---|---|
| 2 | Hand Sink |
| 1 | 3 Compartment Sink |
| 3 | Server Pass Through |
| 2 | Soda Gun/s |
| 2 | Beer Keg Racks |
| 1 | Blender Station |
| 1 | Stainless Steel Drainboard |
| 1 | Blender |
| 1 | Glass Door Refrigerator |
| 1 | Glass or Mug Froster |
| 2 | Bottle Cooler |
| 1 | Draft Beer System |
| 1 | Liquor Display |
| 1 | Glass Washer |
| 1 | 36" Char Broiler |
| 1 | 60" Char Broiler |
| 1 | Sauce Warmer |
| 1 | Flat Top Griddle |
| 1 | Range (note qty of burners) |
| 1 | Multi Vat Fryer System (note vat qty.) |
| 1 | Double Stack Convection Oven |

| | |
|---|---|
| 1 | Standard Convection Oven (bread/cookies) |
| 3 | Drawer Warmer |
| 1 | Salamander/Cheesemelter |
| 1 | Slicer |
| 1 | Rib Cooler (note 27" or 48") (Damon's Only) |
| 1 | 27" Sandwich Prep Table (fits 2 hotel pans) |
| | 48" Sandwich Prep Table (fits 3 hotel pans) |
| | 60" Sandwich Prep Table (fits 4 hotel pans) |
| 1 | 72" Sandwich Prep Table (fits 5 hotel pans) |
| 1 | 60" Pizza Prep Table (fits 8 - 1/3 pans) |
| 1 | 60" Refrigerated Chef Base |
| 1 | Upright Freezer (fry side) |
| 1 | 5 Pan Steam Well |
| 3 | Alto Shaam (cook and hold) |
| 2 | Server Shelf Heat Lamps |
| 1 | Drop In Hot Well |
| 3 | Programmable Microwave |
| 2 | Ice Cream Dipping Cabinet |
| 2 | Dipper Wells |
| 1 | Double Door Upright Desert Refrigerator |
| 1 | Ice Maker |

| | |
|---|---|
| 1 | Ice Maker Bin |
| | Ice Maker Water Filter/s |
| 2 | 2 Compartment Sink/s (prep) |
| 4 | Work Tables (prep) |
| 2 | Stainless Steel Wall Shelves |
| 5 | Wire Dry Storage Shelving |
| 1 | Dunnage Rack/s |
| 2 | Hand Sink/s |
| 1 | Coffee Brewer/s |
| 1 | Tea Brewer/s |
| 2 | Post Mix Dispenser (with ice bin) |
| 1 | Soiled Dish Table |
| | Clean Dish Table |
| 1 | Pot Sink |
| 1 | Pre-Rinse Hose and Sprayer |
| 1 | Dish Washer |
| 1 | Dish Washer Booster Heater |
| 13 | Dish Racks |
| 1 | Walk In Cooler Freezer |
| 3 | Freezer Shelving |
| 7 | Speed Racks |

11  Clean Glass Racks

## Canton Store

7  POS Terminals (note manufacturer/s)

2  POS Cash Drawers

4  Chit Printers

1  BOH Computer

1  Computer Networking Hardware (note item/s)

1  Fax Machine

1  Computer Printer

1  Touch Screen Controller (Damon's Only)

12  Amplifier (Damon's Only)

1  Matrix Switch (Damon's Only)

2  VCR (Damon's Only)

1  Music Receiver (note brand)

29  NTN Buzztime Playmakers (Damon's Only)

42  Table Top Speakers (Damon's Only)

6  Projectors (Damon's Only)

4  Projection Screens (Damon's Only)

4  Projector Bulbs (Damon's Only)

4  CRT Televisions

8  Plasma Televisions

| | |
|---|---|
| 1 | Safe |
| 9 | 24" x 30" 2-top tables |
| 13 | 36" x 36" 4-top tables |
| 24 | 48" x 30" 4-top tables |
| 3 | 72" x 30" 6-top tables |
| 4 | Round Tables (all) |
| 19 | Wooden Chairs |
| 20 | Wooden Bar Stools |
| 43 | Metal Chairs |
| 3 | Metal Bar Stools |
| 6 | Patio Tables |
| 24 | Patio Chairs |
| 6 | Patio Umbrellas |
| 1 | 4 Compartment Sink |
| 1 | Ice Chest |
| 1 | Server Pass Through |
| 3 | Soda Gun/s |
| 2 | Beer Keg Racks |
| 1 | Blender Station |
| 1 | Stainless Steel Drainboard |
| 1 | Blender |

| | |
|---|---|
| 2 | Glass or Mug Froster |
| 1 | Bottle Cooler |
| 1 | Draft Beer System |
| 2 | Liquor Display |
| 1 | Glass Washer |
| 1 | 36" Char Broiler |
| 1 | 60" Char Broiler |
| 0 | 72" Char Broiler |
| 3 | Single Vat Fryer |
| 1 | Portable Fry Filter |
| 2 | Double Stack Convection Oven |
| 1 | Standard Convection Oven (bread/cookies) |
| 1 | Drawer Warmer |
| 1 | Conveyor Oven/Toaster |
| 1 | Salamander/Cheesemelter |
| 1 | Slicer |
| 1 | Rib Sham (ALTOSHAM) Stand-up double unit |
| 3 | 60" Sandwich Prep Table (fits 4 hotel pans) |
| 1 | 72" Sandwich Prep Table (fits 5 hotel pans) |
| 1 | 79" Refrigerated Chef Base |
| 1 | Work Top Freezer (fry side) |

| | |
|---|---|
| 1 | 4 Pan Steam Well |
| 1 | Alto Shaam (cook and hold) |
| 2 | Server Shelf Heat Lamps |
| 3 | Drop In Hot Well |
| 1 | Drop In Cold Well |
| 3 | Programmable Microwave |
| 1 | Ice Cream Dipping Cabinet |
| 2 | Dipper Wells |
| 1 | Double Door Upright Desert Refrigerator |
| 1 | Ice Maker |
| 1 | Ice Maker Bin |
| 2 | Ice Maker Water Filter/s |
| 2 | 3 Compartment Sink/s (prep) |
| 4 | Work Tables (prep) |
| 1 | Stainless Steel Wall Shelves |
| 9 | Wire Dry Storage Shelving |
| 4 | Dunnage Rack/s |
| 3 | Hand Sink/s |
| 1 | Pot Racks |
| 1 | Coffee Brewer/s |
| 1 | Tea Brewer/s |

| | |
|---|---|
| 2 | Post Mix Dispenser (with ice bin) |
| 1 | Soiled Dish Table |
| 1 | Clean Dish Table |
| 1 | Pot Sink |
| 1 | Pre-Rinse Hose and Sprayer |
| 1 | Dish Washer |
| 1 | Dish Washer Booster Heater |
| 17 | Dish Racks |
| 1 | Walk In Cooler Freezer |
| 3 | Freezer Shelving |
| 8 | Speed Racks |
| 21 | Clean Glass Racks |

## Middleburg Heights Store

| | |
|---|---|
| 6 | POS Terminals (note manufacturer/s) |
| 3 | POS Cash Drawers |
| 12 | Chit Printers |
| 2 | BOH Computer |
| 1 | Computer Networking Hardware (note item/s) |
| 1 | Fax Machine |
| 1 | Computer Printer |
| 5 | DirecTV Receivers (note std. or hi-definition) |

| | |
|---|---|
| 1 | Touch Screen Controller (Damon's Only) |
| 1 | Amplifier (Damon's Only) |
| | Matrix Switch (Damon's Only) |
| 6 | VCR (Damon's Only) |
| 1 | Music On Hold (note brand) |
| 31 | NTN Buzztime Playmakers (Damon's Only) |
| 45 | Table Top Speakers (Damon's Only) |
| 4 | Guest Pagers & Charger |
| 7 | Projectors (Damon's Only) |
| 4 | Projection Screens (Damon's Only) |
| 4 | Projector Bulbs (Damon's Only) |
| 14 | CRT Televisions |
| 1 | Safe |
| 3 | 36" x 36" 4-top tables |
| 5 | 48" x 30" 4-top tables |
| 5 | 72" x 30" 6-top tables |
| 75 | Wooden Chairs |
| 18 | Wooden Bar Stools |
| 2 | Hand Sink |
| 1 | 3 Compartment Sink |
| 3 | Server Pass Through |

| | |
|---|---|
| 2 | Soda Gun/s |
| 2 | Beer Keg Racks |
| 1 | Blender Station |
| 1 | Stainless Steel Drainboard |
| 1 | Blender |
| 1 | Glass Door Refrigerator |
| 1 | Glass or Mug Froster |
| 2 | Bottle Cooler |
| 1 | Draft Beer System |
| 1 | Liquor Display |
| 1 | Glass Washer |
| 1 | 36" Char Broiler |
| 1 | 60" Char Broiler |
| 1 | Sauce Warmer |
| 1 | Flat Top Griddle |
| 1 | Range (note qty of burners) |
| 1 | Multi Vat Fryer System (note vat qty.) |
| 1 | Double Stack Convection Oven |
| 1 | Standard Convection Oven (bread/cookies) |
| 3 | Drawer Warmer |
| 1 | Salamander/Cheesemelter |

| | |
|---|---|
| 1 | Slicer |
| 1 | Rib Cooler (note 27" or 48") (Damon's Only) |
| 1 | 27" Sandwich Prep Table (fits 2 hotel pans) |
| | 48" Sandwich Prep Table (fits 3 hotel pans) |
| | 60" Sandwich Prep Table (fits 4 hotel pans) |
| 1 | 72" Sandwich Prep Table (fits 5 hotel pans) |
| 1 | 60" Pizza Prep Table (fits 8 - 1/3 pans) |
| 1 | 60" Refrigerated Chef Base |
| 1 | Upright Freezer (fry side) |
| 1 | 5 Pan Steam Well |
| 3 | Alto Shaam (cook and hold) |
| 2 | Server Shelf Heat Lamps |
| 1 | Drop In Hot Well |
| 3 | Programmable Microwave |
| 2 | Ice Cream Dipping Cabinet |
| 2 | Dipper Wells |
| 1 | Double Door Upright Desert Refrigerator |
| 1 | Ice Maker |
| 1 | Ice Maker Bin |
| | Ice Maker Water Filter/s |
| 2 | 2 Compartment Sink/s (prep) |

| 4 | Work Tables (prep) |
| 2 | Stainless Steel Wall Shelves |
| 5 | Wire Dry Storage Shelving |
| 1 | Dunnage Rack/s |
| 2 | Hand Sink/s |
| 1 | Coffee Brewer/s |
| 1 | Tea Brewer/s |
| 2 | Post Mix Dispenser (with ice bin) |
| 1 | Soiled Dish Table |
|   | Clean Dish Table |
| 1 | Pot Sink |
| 1 | Pre-Rinse Hose and Sprayer |
| 1 | Dish Washer |
| 1 | Dish Washer Booster Heater |
| 13 | Dish Racks |
| 1 | Walk In Cooler Freezer |
| 3 | Freezer Shelving |
| 7 | Speed Racks |
| 11 | Clean Glass Racks |

<u>**SCHEDULE 2.1(e)**</u>

**LICENSES AND PERMITS**

<u>Liquor License 1912500-0085</u>
- 9500 Diamond Center Drive, Mentor, Ohio

Liquor License 1912500-0015
- 17887 Bagley Road, Cleveland, Ohio

Liquor License 1912500-0030
- 701 East Water Street, Sandusky, Ohio

Liquor License 1912500-0025
- 4420 Belden Village Street NW, Canton, Ohio

## SCHEDULE 2.2(d)

## INTELLECTUAL PROPERTY

DAMON'S GRILL

DAMON'S THE PLACE FOR RIBS

DAMON'S GRILL GUEST FIRST

GREAT FOOD. GAME DAY AND EVERYDAY.

## SCHEDULE 4.2

## LIMITATIONS ON AUTHORITY TO SELL

None

## SCHEDULE 4.10

## HAZARDOUS MATERIAL DISCLOSURE

None

## <u>SCHEDULE 4.11</u>

## EMPLOYEE BENEFIT PLANS

None

## EXHIBIT A

## LIST OF RESTAURANTS

A.    17887 Bagley Road, Cleveland, OH 44130 (Middleburg Heights);

B.    9500 Diamond Center Drive, Mentor, OH (Mentor);

C.    701 East Water Street, Sandusky, OH 44870 (Sandusky); and

D.    4220 Belden Village Street NW, Canton, OH (Canton).